LESSER-GOLDMAN COTTON COMPANY v. FLETCHER.

Opinion delivered April 3, 1922.

1. LANDLORD AND TENANT—CANCELLATION OF LEASE—REVOCATION.—
Notice of cancellation of a lease did not terminate the lease where such notice was revoked before being acted upon by the other party.

2. LANDLORD AND TENANT—DOUBLE RENTS FOR HOLDING OVER.—To entitle a landlord or lessor to double rents after termination of the lease, under Crawford & Moses' Dig., § 6557, the holding over by the tenant must be done wilfully.

3. LANDLORD AND TENANT—TENANT HOLDING OVER—DOUBLE RENTS.—
Crawford & Moses' Dig., § 6557, providing that a landlord shall be entitled to recover double rents from a tenant "wilfully"

holding over after term of his lease and thirty days' notice in writing requiring possession, being a penal statute, must be strictly construed and cannot be extended by intendment beyond its express terms.

4.    LANDLORD AND TENANT—WILFUL HOLDING OVER.—A holding over by the tenant under a *bona fide* belief that he has a right to do so, even though he is mistaken, is not a "wilful" holding over under Crawford & Moses', § 6557, entitling the landlord to double rents upon a "wilful" holding over.

5.    LANDLORD AND TENANT—LIABILITY OF ASSIGNEE.—Where a lease required the lessee or his assigns to replace improvements in as good condition as at time of execution of the lease, and a contract between the United States as assignee of such lease and a purchaser of the improvements made upon the land by the United States provided that such sale should be subject to the terms of the lease, and made the lease a part of the contract, and provided that the purchaser would hold the United States harmless from the claims of landowners for damages to the improvements which were on the property at the time of the execution of the lease, the purchaser was liable to the landowners for damages caused by destruction of improvements or failure to restore them to as good condition as they were in at the time the lease was executed.

6.    ESTOPPEL—REPRESENTATION.—Written statements, signed by landowners, in which they agreed to release the United States from liability for damages to improvements on lands leased to the United States, were binding in favor of purchasers of improvements on the lands who had agreed as a condition of purchase to assume the government's liability to the owners.

Appeal from Lonoke Circuit Court; *George W. Clark,* Judge; modified and affirmed.

*Moore, Smith, Moore & Trieber,* for appellants.

1.    The lease of the Fletcher-Goodrum lands was not terminated by cancellation. Where a lease authorizes the lessee to terminate the tenancy at a certain time, he cannot terminate it at some other time. 1 Tiffany, Landlord & Tenant, 86; 16 R. C. L. par. 628. A notice to quit, given by landlord or tenant, may be revoked or withdrawn before it has been acted on. Ann. Cas. 1912-D, p. 682, and authorities cited. Even if that lease is deemed to have been canceled, Fletcher and Goodrum are not

entitled to double damages. The statute, C. & M. Digest, § 6557, is highly penal, and must be strictly construed. 20 Ill. 120; 3 Camp 453; 211 S. W. 908; 82 N. J. Law, 645; 82 Atl. 892; 118 Ga. 906; 45 S. E. 794; 197 Ala. 625; 73 So. 328. The statute does not apply unless the holding over is wilful. A holding over which is not contumacious, but is under a reasonable mistake as to the tenant's rights, is not wilful. 38 Ill. App. 128; 230 Ill. 454; 82 N. E. 833; 130 Ky. 789; 114 S. W. 284; 136 Ky. 39; 123 S. W. 326; 6 H. & N. 846; 191 N. Y. 306; 84 N. E. 75.

2. There was no liability on the part of the United States to the landowners for damages. Such being the case, an alleged oral agreement on the part of Lesser-Goldman Cotton Company for the benefit of the landowners, independent of its contract to assume the liability of the United States, assuming to pay their claims regardless of liability of the United States, is not enforceable by them for lack of consideration. 65 Ark. 27; 101 *Id.* 223; 110 *Id.* 578; 121 *Id.* 414; 128 *Id.* 149; 144 *Id.* 8. See also 6 R. C. L., Contracts, par. 270-277.

The alleged oral contract, before it was acted upon by either the landowners or the road district, was merged into the written contract between the United States and Lesser-Goldman Cotton Company, and that contract exclusively defines the rights of any of the parties to this suit to hold the latter for their damages. 2 Elliott on Contracts, § 1415; 33 R. I. 464, 82 Atl. 225; 56 Iowa 349; 9 N. W. 293; 172 Ill. 563; 50 N. E. 219; 95 N. Y. 423; 38 Ohio St. 543; 80 Ky. 409; 27 N. J. Eq. 650; 6 N. D. 438; 71 N. W. 125; 153 Ind. 393; 53 N. E. 769. At most, the landowners and road district cannot recover greater damages than they respectively agreed to accept at the sale, with interest.

*W. P. Beard* and *Mehaffy, Donham & Mehaffy,* for Fletcher and Goodrum.

1. Adopt briefs and arguments filed on behalf of appellees Williams and Williams & Pierson, and in addition urge that appellant cotton company by its answer not

only admitted liability, but also that payment to these landowners was a part of the purchase price at the sale—constituted one of the terms thereof. 134 Fed. 241.

2. The lease on the Fletcher-Goodrum lands was terminated by cancellation. Notice was given, and Fletcher gave express consent to the termination. The notice required by a lease may be waived. 29 L. R. A. (N. S.) 177; 147 Ill. App. 18; 126 Ark. 38; 70 *Id.* 406; 120 *Id.* 268; 88 *Id.* 138; 32 Atl. 64; 24 Cyc. 1334-1339.

3. Fletcher and Goodrum were entitled under the statute, C. & M. Dig., § 6557, to double damages. 74 Ark. 12.

*J. H. Carmichael* and *Coleman, Robinson & House,* for appellee W. A. Williams.

1. As to the appellee Williams, appellants raise only the question as to whether or not the instruction numbered 1 is a correct declaration of law, admitting that there was evidence on which to base the instruction, but contending that the facts do not make out a case of liability. This suit is not based on the leases, but on a special contract made between the three parties to the sale itself, whereby the appellant promised to pay Williams the $1,000 which he had agreed to take, and the facts bring the case squarely within the doctrine that "when a promise is made to one upon a sufficient consideration, for the benefit of another, the beneficiary may sue the promissor for a breach of his promise." 65 Ark. 27. That is the first prerequisite to appellee's right to recover in this case. The second existed also, viz: privity between the promisee and Williams, and the obligation on the part of the promisee toward him. *Id.* Williams was not a stranger to the contract. A consideration moved from him, and there was a duty or obligation on the part of the Government to him. He was an actual party to the contract itself. 93 U. S. 148; 93 Ark. 346; 46 *Id.* 132; 91 *Id.* 367; 31 *Id.* 155; 119 *Id.* 64.

2. In response to appellant's contention that the Government and appellant afterwards changed the terms

of the contract in such way as to release appellant from liability to Williams, and that they had the right to change it at any time before acceptance by Williams: the evidence conclusively shows an acceptance by him. Moreover, an acceptance on his part will be presumed. 2 Elliott on Contracts, § 1414; *Id.* 1415; 8 Pac. 280; 50 *Id.* 597; 93 N. W. 440; 58 Mo. 586.

*Coleman, Robinson & House,* and *Carmichael & Brooks,* for cross-appellants, W. A. Williams and R. Pierson.

*James B. Reed* and *Thos. C. Trimble, Jr.,* for Lonoke Chamber of Commerce.

*Chas. A. Walls,* for Road Improvement District No. 4.

WOOD, J.  On August 1, 1917, George B. Fletcher and Ella Mae Goodrum (hereafter for convenience called Fletcher-Goodrum) executed an assignable lease to W. W. McCreary to 160 acres of land, and on the same day W. A. Williams executed a similar lease to McCreary to 720 acres of land, all in Lonoke County, Arkansas. The consideration for the Fletcher-Goodrum lease was an annual rental of $720, and of the Williams lease for the annual rental of $5,500, both payable in advance. The leases gave the lessee an option to purchase at sums named therein at any time during the period of the leases. The Fletcher-Goodrum lease ran until December 31, 1920, and the Williams lease until December 31, 1921. The lessee, or his assigns, were given the right of cancellation upon written notice to the lessors on or before October 1st in any year, the possession of the premises to be surrendered on or before the end of the year in which notice was given.

Among other provisions the leases contained the following: "In case of the removal or destruction of irrigation plant machinery, houses or fences, the lessee or its assigns shall replace such improvements in as good condition as the same were at the date of this lease contract, at the conclusion of the lease. * * * * The undersigned (landowner) further agrees * * * * to permit the

removal of buildings and improvements which may be erected by the lessee or his assigns, at the expiration of the lease." * * * * "He (lessee) shall have the right to assign or sublease the same to the United States Government, its officers, agents, or attorneys."

On the 26th of October, 1917, McCrary executed the following assignments of the leases: "For and in consideration of the sum of $1 and other valuable considerations, I, W. W. McCrary, do hereby transfer, assign and sublease the foregoing contract with all rights thereto to Charles A. Walls, president of the Lonoke Chamber of Commerce, for the use and benefit of the United States Government."

The contract between the Chamber of Commerce, the lessor, and the lessee, the United States, contained among others the following provisions: "That said lessor agrees that the lessee, without expense, may demolish or destroy any and all buildings, and any crops now growing on said land, in so far as they interfere with the use of the site for aeronautical purposes." "That the said lessor shall close all roads on the property hereby leased, seeking such legal proceedings as may be necessary to effectuate the same." "The lessor agrees that, at the expiration of this lease and any renewal thereof, the lessee may within a reasonable time remove any and all buildings, structures and other improvements, or part of buildings, structures, or other improvements, placed or erected on said premises, during the term thereof, or any renewal thereof, all expenses connected with such removal to be borne by the lessee." "That it (United States) will commit no waste and will not suffer the same to be committed, and will not misuse or injure the said premises, except in so far as is consistent with the use of this tract for aeronautical purposes." "That the lessee reserves the right to quit, relinquish and give up the said premises at any time within the period for which this lease is made or may be renewed, by giving to the said lessor or agents thirty days' notice in writing."

The landowners for "valuable consideration" executed a writing ratifying and confirming the action of the chamber of commerce in the execution of the leases and option, and agreed on their part "to perform and carry out all of the terms of said lease."

On December 10, 1919, the United States sold its improvements on the leased lands at public auction. The officer conducting the sale for the government passed out to the bidders a printed announcement containing the conditions of the sale, which, among other things, provided: "* * * * the successful bidder to release the government from all claims of property damage from the owners of the land, and any or all claims for replacement of improvements which the United States is obligated to replace for the property owners, under provisions of lease by which this land is held. * * * * It is agreed and understood by the successful bidder that all improvements must be removed and releases as specified, in this announcement, for the United States, must be furnished its representative, the chief of construction division, War Department, Washington, D. C., on or before June 30, 1920. A surety bond of $20,000 will be required when this deal is closed to insure the carrying out of the provisions of this announcement."

Before the sale was announced and bidding began, Burt Brooks, an attorney representing one Pierson, announced that Pierson had purchased from Williams and had a claim for damages to the Williams lands, in the sum of $70,000 against the United States, and that the purchaser of the property would have a lawsuit on his hands. Thereupon the sale was adjourned until the afternoon. When the sale was resumed, the officer in charge read out written statements of damage claims signed by Fletcher and Goodrum, Williams, and the county judge of Lonoke County and the commissioners of Road District No. 4. Fletcher and Goodrum agreed to release the United States and the chamber of commerce from all damages to their lands for the sum of $6,561. Williams signed a similar agreement to release all damages to his lands for

the sum of $10,000, and the road district agreed to release all damages to the road for the sum of $2,000. At the same time the officer in charge of the sale read the report of a board of officers appointed by him to estimate the damages. This report stated that the Williams land could be restored to its original condition for $12,850, the Fletcher-Goodrum land for $6,000, and the road to its original condition for the sum of $2,000. This board pronounced the Pierson claim a hold-up, and also stated that a $20,000 bond from the purchaser would be ample to protect the United States against all claims. The officer further stated that the government did not guarantee that $20,000 was the limit of what might have to be paid; that it might be more and might be less.

According to the version of some who were present at the sale, the officer made the further announcement that the bidders would have to take the printed announcement of the conditions of the sale just as it was read, and that the successful bidder would have to indemnify the United States against all claims of the landowners. According to another witness, the officer announced that the purchaser would be required to give a bond in the sum of $20,000 for the restoration of the field when the plant had been dismantled to its former condition.

The Lesser-Goldman Cotton Company (hereafter called company) bid $30,000 for the property of the government, and on December 15, 1920, entered into a contract with the United States which had attached thereto, and made a part thereof, copies of the leases from the landowners to McCrary, the assignments by him to the chamber of commerce, a copy of the lease from the chamber of commerce to the United States, and a copy of the printed announcement of the conditions of the sale of the government property. The contract acknowledged a consideration of $30,000 cash paid by the company and its undertaking as to the extent set forth in the contract "to save and protect and hold harmless" the United States "from any and all claims on the part of the owners of the lands (describing them) for and on

account of all property damages to said lands, and all replacements or improvements thereon, and all removals of structures therefrom which'' the United States ''may be under obligations to pay and replace and remove pursuant to the provisions of the leases which were taken from the said owners of said lands by W. W. McCrary, and by the latter assigned to the Lonoke Chamber of Commerce, and of the lease which was taken by'' the United States ''from the said Lonoke Chamber of Commerce with ratifications thereof by the respective said landowners.'' For the considerations mentioned, the United States sold and delivered to the company the improvements ''as set forth in the announcement of terms and conditions of sale of government-owned improvements at Eberts Field, dated December 10, 1919.''

It was provided in the contract that the company ''agrees that it will, at an expense to itself not exceeding the penal sum of the bond hereinafter described, protect and save and hold harmless'' the United States ''from any and all claims of the owners of any of said lands for and on account of all property damages thereto done or suffered by'' the United States, ''and to make replacements of improvements on said lands, and for and on account of any obligation of'' the United States ''to remove any buildings, improvements, roads, foundations or other structures placed on said lands by'' the United States, ''which said claims for property damages or replacements or removals arise out of the provisions of said leases and ratifications.''

Under the terms of the contract performance by the company was to be evidenced by its procuring for the United States valid and complete releases from the owners of the lands of all their claims or by satisfying all judgments recovered by the landowners in suits or other proceedings against the United States or the company in respect to any of the claims. The company agreed to defend such suits or proceedings at its own expense. It was contemplated that the company would dispose of all

claims by June 30, 1920, but the United States agreed that the company should have whatever additional time might be required after the expiration of the government's lease that the United States itself was entitled to under the lease and ratifications thereof by the landowners. It was further expressed in the contract that the intent was "to create and extend to the said landowners a direct cause of action by them against" the Lesser-Goldman Company "for and on account of said claims in any court of competent jurisdiction. * * * * ."

The bond provided that the company would faithfully and fully perform the obligations resting on it as set out in the contract, in the penal sum of $20,000, which sum was stipulated to be the limit of liability both of the company and the surety on the bond for and on account of any and all of the obligations of the company under the provisions of the contract.

On January 15, 1920, Fletcher-Goodrum, in a letter to the company, demanded an immediate settlement of the damages due them and warned it that the damages would be enhanced if the 1920 crop was lost through failure to secure such settlement. On September 27, 1920, the company released possession of the land and so notified the United States.

On May 19, Fletcher-Goodrum instituted this action in the Lonoke Circuit Court against the company and Lynch Creekmore and H. M. Bennett, agents of the company, and the Lonoke Chamber of Commerce, to recover damages to improvements on their lands in the sum of $10,000, and the sum of $20,000 rent for the year 1920, which they alleged grew out of their contract of lease to McCrary and the several contracts above mentioned.

The company set up that the defendants Creekmore and Bennett were its agents, and that it assumed full responsibility for all their acts. It denied liability, but set up that, if liable at all, the limit of its liability under the contract was $20,000 to all of the landowners. The answer contained a motion that Williams, Pierson and

the road district be made parties plaintiff and required to set up their respective claims. The answer also contained a motion to transfer to the equity court. It also set up that, if liable at all, the company would be entitled to judgment in the same amounts against the chamber of commerce. It prayed that it be dismissed without cost, and, in the alternative, if any judgments were recovered against it by the plaintiffs, it be allowed to recover in the amount of plaintiffs' judgments against the chamber of commerce.

The court directed that Williams, Pierson, and the Road District No. 4 be made parties plaintiff, which was done. The court overruled the motion to transfer to equity. There was evidence adduced at the trial by which it was estimated that the damage by the United States to Fletcher-Goodrum lands was $24,176.40; to the Williams lands in the sum of $60,130, and to the road district in the sum of $6,000. It was conceded that all the damage done by the United States and the improvements made were necessary in the use of the field for aeronautical purposes. The court instructed the jury that if they found for the plaintiffs, Fletcher-Goodrum, the amount they would be entitled to recover as damages to the lands could not exceed the sum of $6,561, the amount they specified at the auction sale, with interest from the date of such sale; and that if they found in favor of Williams and Pierson, the amount of their damages would be the sum of $10,000, the amount specified by them on the day of sale, with interest from that date. (No separate damages were claimed for Pierson). The court instructed the jury that if they found in favor of the road district they could return damages in the sum of $6,000. It was agreed that, if the company were liable, the testimony would show that the road district had sustained damages in the sum of $6,000.

At the request of the plaintiffs, except the road district, the court in substance instructed the jury that if, in the printed announcement of sale, it was stated that the successful bidder would be required to release the

government from all claims for damages from owners of the land and from all claims for replacement of improvements which the United States was obligated to replace under the provisions of the lease under which it held the land, and that if at the sale some question was raised by the bidders as to the respective amounts of the claims of the landowners, and the officer of the government conducting the sale adjourned the sale until the afternoon in order that such amounts be ascertained, and that such amounts were ascertained and agreed upon by the plaintiffs and were announced to prospective bidders when the sale was resumed in the afternoon, and that if it was further announced that the successful bidder would have to pay the amounts of these claims in addition to the amount bid by him, then the company would be liable for the amounts of these claims.

The court also instructed the jury that the road district was not bound by the representation as to the amount of its damages made by the county judge and the road commissioners when the sale was made. The court refused to instruct the jury at the request of the plaintiffs, Williams and Pierson, as follows: "You are instructed that, in the lease from Williams to W. W. McCrary, the lessee, or his assignee, was bound to replace all improvements in as good condition as they were on August 1, 1917, and that the terms of said lease were not abrogated by the lease from the chamber of commerce to the United States Government, nor by the alleged ratification by said Williams, nor was this duty or liability fixed or limited by the contract of December 15, 1919, between the Lesser-Goldman Cotton Company and the United States Government, and you will find for the plaintiff Williams in such an amount as you may find it would cost Williams to put the place named in the lease to McCrary in the condition it was in on August 1, 1917."

The company prayed the court for instructions telling the jury in effect that the rights of the plaintiffs to damages depended upon the written contract of December 15, 1919, between it and the United States, which was

one merely of indemnity as to the claims of the land-owners and which imposed no duty at all as to the claim of the road district. The company also asked the court to instruct the jury to return a verdict in its favor against all of the parties seeking a judgment against it. The court refused these instructions. Exceptions were saved by the respective parties to the ruling of the court in giving and refusing instructions which were contrary to their respective contentions.

The jury returned a verdict in favor of Fletcher-Goodrum against the company and Lynch Creekmore in the sum of $1,000 for rent of their lands, and against the company in the sum of $6,561 with interest as damages to their lands; in favor of Williams on account of damages to his lands in the sum of $10,816.66, with interest, and in favor of the road district in the sum of $6,000, with interest. The jury returned verdicts in favor of the defendants, Lynch Creekmore and H. M. Bennett, agents, and also in favor of the Lonoke Chamber of Commerce as against all the plaintiffs.

Judgments were rendered against the company and Lynch Creekmore in favor of Fletcher and Goodrum for rent in the sum of $2,000, the same being double the amount of the verdict returned by the jury; against the company in favor of Fletcher and Goodrum in the sum of $6,561 with interest thereon from date of the sale; and against the company in favor of Williams in the sum of $10,816.66; and against the company in favor of the road district in the sum of $6,000, from which judgments the appellants duly prosecute this appeal, and all of the appellees except the chamber of commerce prosecute a cross-appeal. Any other necessary facts will be stated as we proceed.

1. The lease of the Fletcher-Goodrum lands was not terminated by cancellation either under the terms of the lease of such lands to McCrary or the lease of the chamber of commerce to the United States which Fletcher-Goodrum ratified. The notice was by telegram dated

November 29, 1919, from the Director of Air Service to the Lonoke Chamber of Commerce, notifying the latter of the cancellation of the lease to take effect December 31, 1919. This telegram was followed by letter of December 1, 1919, confirming the telegram and including notice of the cancellation, with the request that admission of the service of such notice be signed by the chamber of commerce and returned as promptly as convenient. Upon receipt of the telegram the president of the chamber of commerce immediately notified the landowners. The landowners verbally acquiesced. On December 3, the Director of Air Service telegraphed the chamber of commerce to disregard the notice of cancellation by previous telegram and letter. The president of the chamber of commerce also notified the landowners of the last telegram, and it does not appear that, intervening the first telegram and letter and the receipt of the last telegram, the chamber of commerce had by letter or otherwise notified the Director of Air Service that the notice had been served, nor does it appear that the landowners had acted upon the telegram and letter giving notice of cancellation. The rights of the parties therefore had not been in any manner affected by the notice of cancellation before the same was revoked.

A notice of cancellation of a lease to take effect in the future may be revoked or withdrawn before it has been acted on by the other party to the contract, and in such case the rights of the parties under the contract are the same thereafter as if the notice of cancellation had not been given. This doctrine is supported by the decided preponderance of the authorities in this country. See *Wisner* v. *Richards*, 24 Ann. Cas. 1912-D, p. 162, and cases there cited. We are aware that there are respectable authorities which hold that when a valid notice to quit is given by the landlord or tenant, the party to whom it is given is entitled to count upon it, and it cannot be withdrawn without the consent of both parties. See *Western Union Tel. Co.* v. *Pac. Ry. Co.* 120 Fed. 362. But,

even if we are mistaken in holding that the lease was not terminated by cancellation, still Fletcher-Goodrum would not be entitled to recover double damages for the retention of the lands under § 6557 Crawford & Moses' Digest. For, under the statute, to entitle the landlord or lessor to double rents after the termination of the lease term, the holding over by the tenant must be done wilfully. The statute is highly penal, must be strictly construed, and cannot be extended by intendment beyond its express terms. A holding over by the tenant under the *bona fide* belief that he has the right to do so, even though he were mistaken, is not a wilful or contumacious holding under the statute, where the undisputed facts show, as they do here, that there were reasonable grounds for such belief. *Belles v. Anderson,* 38 Ill. App. 128; *Alexander v. Loeb,* 230 Ill. 454, 82 N. E. 833; *Aull v. Bowling Green Opera House Co.,* 130 Ky. 789, 114 S. W. 284; *Jones v. Taylor,* 136 Ky. 39, 123 S. W. 326; *Swinfen v. Bacon,* 6 H. & N. 846; *Barson v. Mulligan,* 191 N. Y. 306, 84 N. E. 75.

The case of *Driver v. Edrington,* 74 Ark. 12, does not contravene the above doctrine, for in that case there was a holding over by the tenant, after he knew that his term had expired and after he had lawful notice to vacate, simply because it was inconvenient and injurious to his business. The holding over by the tenant in that case was not grounded upon facts which justified an honest belief that he had the right to do so.

2. It will be observed that the original leases from Fletcher-Goodrum and from Williams to McCrary contained this provision: "In case of the removal or destruction of irrigation plant, houses, or fences, the lessee or its assigns shall replace such improvements in as good condition as the same was at the date of this lease contract." The contract between the appellant and the United States by which the latter sold to the former the "government-owned improvements" expressly makes these leases to McCrary "with all the terms, provisions, conditions and covenants thereof" a part of that con-

tract.  The announcement of the terms and conditions of the sale of the government-owned improvements, in pursuance of which the sale was made and the written contract of sale between the appellant and the United States entered into, contains a provision to the effect that the "successful bidder shall release the government from all claims of property damage from owners of the land and any or all claims for replacement of all improvements which the United States is obliged to replace for the property owners under the provisions of the lease by which this land is held."  This written announcement of the terms and conditions of the sale is also expressly made a part of the contract of sale between the appellant and the United States.  The contract of sale between the appellant and the United States likewise makes the lease of the chamber of commerce to the United States and the ratifications thereof by the landowners a part of the contract of sale.  The transfer or assignment of the lease from McCrary to the Lonoke Chamber of Commerce shows that it was done "for the use and benefit of the United States Government."

Now, the manifest intention of the parties to the contract of sale in making all of the above instruments with all of their terms, conditions, provisions and covenants a part of the contract of sale, was to preserve the rights of the landowners as against the United States Government for and on account of all property damages to their lands and all replacements of improvements thereon which the United States Government "may be under obligation to pay and replace and remove pursuant to the provisions of the leases which were taken from the said landowners of said lands by W. W. McCrary."  The purpose of the contract, as clearly expressed therein, was that the appellant should "save and protect and hold harmless" the United States from the claims of the landowners.  In other words, as we construe the contract of sale, it bound the appellant to pay any and all claims of

the landowners for damages that the **United States** would have to pay them under the leases. The language of the contract of sale shows that the parties to it at the time of its execution recognized that the landowners had claims for damages against the United States, which the latter would have to pay as a part of the consideration of the sale of the government-owned improvements. Under the original leases to McCrary, he and his assigns were liable to the landowners for all damages to their lands caused by the destruction of improvements or by failure to restore the same in as good condition as they were at the time the leases were executed. Taking the provisions of the contract as a whole, it cannot be construed as one intending merely to indemnify the government against the claims of the landowners, but a contract by which the appellant assumed payment of these claims. The contract in terms says that the intent of the provisions "is to create and extend to the landowners a direct cause of action against the said party of the second part" (appellant). If the contract had intended to indemnify the government merely, the above language would not have been used.

While there was no direct assignment of the leases from McCrary to the United States Government, the undisputed testimony shows that the assignment by him to the chamber of commerce was, as we have stated, for the use and benefit of the United States Government, and, so far as the landowners were concerned, the independent leases executed by the chamber of commerce operated as a transfer or assignment of their title to the United States Government. The undisputed facts show that the taking of the leases, their assignment to the chamber of commerce, the execution of the leases by the chamber of commerce to the United States Government, and the ratification of these leases by the landowners was all done for the purpose of putting the lease title in the United States, the United States assuming all the obligations of the lessee under the original leases. This was certainly

the interpretation which the officers of the United States Government, entrusted with the duty of executing and carrying out the obligations of the United States under these leases, gave the original leases and the leases of the chamber of commerce and the ratification thereof at the time of the sale of the government-owned property. It was also the interpretation of the landowners at that time. And we believe it was likewise the interpretation of the appellant, as shown by the express provisions of the contract itself, in making all the instruments evidencing any rights growing out of the leases a part of the contract of sale. In the light of all the written instruments and the contract thereunder of the parties thereto, as shown by the undisputed testimony, we are convinced that the appellees were not strangers to the contract of sale and to the consideration thereof, as contended by learned counsel for appellant. But, on the contrary, the undisputed facts of this record show that by the express terms of the contract the appellees were privies to the extent of their interest with the United States Government. A consideration had moved from the landowners to the United States under the lease contracts, and by the terms of these contracts the United States was liable to them for all damages they had sustained. The United States, by its contract with the appellant, provided that the latter should pay these damages.

The uncontroverted facts of this record bring the case squarely within the doctrine announced by this court in *Thomas Mfg. Co.* v. *Prather,* 65 Ark. 27-29, as follows: "Where a promise is made to one upon a sufficient consideration for the benefit of another, the beneficiary may sue the promissor for a breach of his promise." As prerequisites of the application of the doctrine, we further said, quoting from the N. Y. Court of Appeals in *Vrooman* v. *Turner,* 69 N. Y. 280, "There must be, first, an intent by the promisee to secure some benefit to the third party; and, second, some privity between the two—the promisee and the party to be benefited—and some ob-

ligation or duty owing from the former to the latter which would give him a legal or equitable claim to the benefit of the promise." See also *Little Rock Ry. & Elec. Co.* v. *McDowell,* 101 Ark. 223-26; *Dickinson* v. *McCoppin,* 121 Ark. 414-18; *Ga. State Sav. Assn.* v. *Dearing,* 128 Ark. 149-54; *Schmidt* v. *Griffith,* 144 Ark. 8.

3. This brings us to the question of the amounts of damages which the appellees were entitled to recover. The written instruments signed by the respective landowners and those representing Road District No. 4, in which they agreed to release the United States Government and the chamber of commerce in consideration of the amounts set forth in their respective statements, are binding upon them as against the United States, and the appellant, who, under the contract of sale, as we have seen, assumed the liabilities of the United States Government for the damages that the landowners sustained under their respective leases. The United States, the party making the sale, and the appellant, the party purchasing, had the right to rely upon these statements as fixing the amounts of "all damages whatsoever" resulting to the appellees by reason of the occupancy of their lands as an aviation field by the United States Government under the terms of the lease contract. The appellees are estopped by their conduct, in executing these agreements and permitting them to be read at the sale before the bidding commenced, from afterward asserting that they sustained greater damages than the sums set forth in these agreements. As the undisputed testimony shows, these agreements were especially executed for the purpose of declaring an amount which would fix the limit of damages beyond which the United States and the purchaser at the sale would not be liable. The county judge and the commissioners were the duly authorized agents representing the road district and had the power to fix the amount of the damages that the district had sustained at the hands of the United States Government in its appropriation of the road of the district. It was agreed that, if the appellant were liable,

the testimony would show that the district had sustained damages in the sum of $6,000. But the appellant contended that, if liable, the district should not be allowed to recover in a sum exceeding $2,000, the amount set forth in the written statement of the road district signed by the county judge and the road commissioners and read on the day of sale. The appellant is correct in this contention. The district is estopped by the conduct of its duly authorized agents from claiming a greater amount than was set up in the written statement as the amount of the damages to the district. The court therefore erred in its instruction telling the jury that the district was entitled to recover in the sum of $6,000.

4. It follows from our construction of the contract of sale between the appellant and the United States, that the appellant was liable to the appellees, except the chamber of commerce, for all damages caused by the United States in its occupancy of their lands. The court therefore ruled correctly in instructing the jury to return a verdict in favor of the chamber of commerce, except as to the rent due Fletcher-Goodrum for the year 1920. (The sum of $720 rent was tendered them by the chamber of commerce and refused). The instructions of the court were correct except in the particulars indicated.

The judgment of the court in favor of Fletcher-Goodrum against appellant for rents will be reversed, and judgment will be entered here in their favor against the chamber of commerce for the sum of $720, with interest from date. The judgment in favor of the road district will be modified by reducing the same to the sum of $2,000, with interest. In all other respects the judgment is correct, and, after being modified as above indicated, it is affirmed.

McCulloch, C. J., (dissenting). The opinion of the majority contains a recital of the clauses in the lease-contract between the United States Government and the Lonoke Chamber of Commerce giving the lessee authority

to destroy buildings and crops which would interfere with the use of the premises for aeronautical purposes, and to commit waste and to injure the premises for such purposes; but in the discussion of the facts and the principles of law applicable thereto, which control the decision of the case, those features of the contract are completely ignored.

The clauses to which I refer read as follows: "That said lessor (chamber of commerce) agrees that the lessee (United States), without expense, may demolish or destroy any and all buildings, and any crops now growing on said land, in so far as they interfere with the use of the site for aeronautical purposes. That it (United States) will commit no waste and will not suffer the same to be committed and will not misuse or injure the said premises, except in so far as is consistent with the use of this tract for aeronautical purposes."

The original lessors, the landowners, entered into an additional contract with the United States Government ratifying the lease made with the chamber of commerce.

It is undisputed, and the record contains an express concession, that all the damages done and changes made by the United States Government were necessary for the use of the premises for aeronautical purposes. This being true, there is no liability, under the contract, on the part of the Government to the landowners.

Learned counsel for one of the appellants argue that the above-quoted clause of the contract gives permission to demolish the buildings and crops, but that it does not mean that it could be done without compensation to the landowners. In other words, they argue that the words "without expense" only mean that it should be without expense to the government's lessor, the Lonoke Chamber of Commerce. This is not, in my opinion, a proper interpretation of the contract.

Under the language used, permission was expressly granted to the government to demolish the buildings and

crops so far as necessary for the use of the premises for aeronautical purposes, and, unless the contract itself provided for compensation, there is no liability imposed on the government for the damage done.

Where a contract authorizes a thing to be done, it is necessarily implied that it will be permitted without liability for compensation, unless provided for in the contract.

It would seem from the way in which the words "without expense" are used that it was meant that the government should be without expense or liability; but, even if it does not mean that, the use of that term would have no other bearing on the question of liability of the government unless it can be construed to mean that the government shall pay the damages done by the destruction. I can scarcely conceive that the words "without expense" can be construed to mean that the government shall pay damages or become liable for damages incurred in that way.

It seems to me, therefore, that it necessarily results from a fair interpretation of this clause of the contract that there is no liability on the part of the government, and, that being true, there can be none on the part of appellant under its contract with the government. Conceding that the contract between appellant and the government is all that appellees claim it to be with respect to the assumption of the obligation of the government, there is no liability for the simple reason that the government itself is not responsible, and there is no liability, therefore, to be assumed by appellant.

The trial court gave instructions permitting recovery under the alleged oral agreement at the auction sale to assume the obligation of the claimants, and the verdict of the jury was based upon a finding upon that issue. There was a conflict in the testimony, but there was enough testimony to sustain the contention of appellees with respect to what occurred at the sale. This court has, however, affirmed the judgment of recovery in favor of

appellees on the theory that the undisputed evidence, that is to say, the contract which was entered into later between appelllant and the government, established liability for the claims.

I think the rights of the parties must be determined by the terms of the written contract entered into between the government and appellant subsequent to the sale, for the claims asserted by appellees, so far as concerns liability of appellant, derive their existence from the contract between the principal contractors—the government and appellant.

Until a binding contract was entered into between the parties, no liability could arise in favor of appellees. The terms of the contract as finally reduced to writing after the sale must therefore control in determining the liability of appellant. The incidents of the sale itself can not be considered for the purpose of construing the contract, for they were only antecedent transactions, which became merged into the contract itself when reduced to writing and signed by the parties as evidence of their several undertakings.

I agree with counsel for appellant that the doctrine of liability of one person upon a contract made for his benefit by another cannot be extended to contracts for indemnity. None of our cases go to that extent, and I do not believe that any cases can be found where the doctrine is thus extended. Any other rule would be contrary to the reasoning upon which such liability is based, which is that a promise made for another's benefit creates a right of action in his favor. Now, a contract merely for indemnity is not made for the benefit of any one except the party to the contract who is to be indemnified thereby, and no rights accrue thereunder to a person against whose claim indemnity is given under the contract.

But it seems to me that this contract, when considered as a whole, is not one merely of indemnity, but that it amounts to a contract on the part of the appellant

to assume the obligation of the government to the land-owners—the original lessors. It is true that in the contract the word "indemnity" is used, but the contract contains an express stipulation that appellant should not only "save and hold harmless the party of the first part from all claims of the owners of any of said lands," etc., but it goes further and states that the performance of such undertaking should be evidenced "by said party of the second part procuring for and delivering to the said party of the first part either valid and complete releases from the owner of said lands of all the claims of the latter as aforesaid, or satisfactions in full of all judgments." And it is also declared in the contract that a cause of action in favor of the landowners is created against appellant under its contract of indemnity.

Of course, the parties had no right to declare a right of action where none could exist under the law, but the last-mentioned feature of the contract demonstrates an intention that appellant should assume and pay the obligation of the government to the landowners.

Taking the contract as a whole, while it uses language which makes it a contract of indemnity, it is more than that, for it, in effect, constitutes an obligation to assume and discharge the liability to the landowners.

My view is that there is no liability in this case to the road district for any sum. The district was not a landowner nor a lessor, and there was no obligation on the part of appellant in its contract with the government to assume any other obligation except that to the landowners.